236                              428 Mass. 236 (1998)

Olympia & York State Street Company v. Board of Assessors of Boston.

## OLYMPIA & YORK STATE STREET COMPANY vs. BOARD OF ASSESSORS OF BOSTON.

Suffolk. September 2, 1998. - October 16, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Taxation,* Real estate tax: abatement, assessment, value; Appellate Tax Board: formal procedure; Appraisers. *Value. Evidence,* Value, Expert opinion.

Substantial evidence supported a determination of the Appellate Tax Board that there existed in Boston for the tax years in question a "Class A+" office tower submarket for the purpose of determining the fair cash value of a certain property with reference to, inter alia, comparable vacancy and credit loss rates. [240-241]

The Appellate Tax Board's findings as to vacancy rate, credit loss, capitalization of income rate, tenant improvements, and leasing commissions, used by the board to determine the fair cash value of a certain office tower in Boston, were supported by the record of the proceedings. [241-243]

The Appellate Tax Board did not abuse its discretion in denying a taxpayer's motion to compel the production of information about other similarly situated taxpayers, collected by a board of assessors pursuant to G. L. c. 59, §§ 38D, 38E, 61A, and G. L. c. 58A, § 8A, where such information was confidential under the terms of G. L. c. 59, § 52B, and where public policy supported protection of the confidentiality of the information. [243-244]

Dismissal by the Appellate Tax Board of a taxpayer's appeal of the denial of an abatement was not required by the taxpayer's alleged failure to produce witnesses with knowledge of the fair cash value of the property, where the subpoenas issued by the assessors pursuant to G. L. c. 59, §§ 38D, 38E, and 61A, were not sufficiently clear to establish an obligation of the taxpayer to produce such witnesses and where the assessors failed to call one of the two witnesses who did appear in response to the subpoenas to testify before the board. [245-246]

The Appellate Tax Board properly excluded from evidence the taxpayer's estimates of the value of its leased-fee interest in the property in question, made for use in a bankruptcy proceeding, where those appraisals were not demonstrated to be relevant to the fair cash value of the property as a fee simple estate for tax purposes. [246-249]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*John C. Plotkin (Seni M. Adio* with him) for the plaintiff.

*Philip Burling (Barbara A. Fiacco* with him) for the defendant.

GREANEY, J. We granted an application for direct appellate review to consider cross appeals brought by Olympia & York State Street Company (taxpayer),[1] and the board of assessors of Boston (assessors) from a decision by the Appellate Tax Board (board) concerning the fair cash value of the taxpayer's office tower located at 53 State Street, a building which is commonly referred to as "Exchange Place" (property). At issue was the valuation of the property for fiscal years 1992 through 1996. The board found that the assessors had overvalued the property in fiscal years 1992 through 1995 and granted abatements for those years. The board also decided that the property had not been overvalued for fiscal year 1996.

The taxpayer contends that the board erred by (1) basing its decision on the existence of a "Class A+" office tower "submarket" in Boston; (2) making findings concerning vacancy rate, credit loss, capitalization of income rate, tenant improvements, and leasing commissions which were not based on substantial evidence; and (3) refusing to admit responses made under G. L. c. 59, §§ 38D and 61A, by other building owners which the taxpayer claims were relevant to the fair cash value of its property and would have disclosed the absence of any "Class A+" submarket of office towers. In their appeal, the assessors assert that the board erred by (1) denying a motion to dismiss the taxpayer's appeals because the taxpayer failed to comply with an order to produce a representative of the owner who could testify knowledgeably about the fair cash value placed on the property during the fiscal years in issue; and (2) concluding that the assessors could not obtain, or admit in evidence, the taxpayer's estimates of value of its leased-fee interest in the property. We discern no error by the board on any of the claims just described. Accordingly, we affirm the board's decision.

The board held sixteen days of hearings, and, in addition to the testimony of the witnesses, considered 177 exhibits. The board's decision contained findings of fact and a report pursu-

---

[1]Olympia & York State Street Company, in whose name the proceeding was commenced, has since been succeeded by Olympia & York State Limited Partnership, which is now known as WFP 53 State Street Co. Limited Partnership.

ant to G. L. c. 58A, § 13. The board found the fair cash value of the fee simple estate of the property to be $168,000,000 for fiscal year 1992, $156,000,000 for fiscal year 1993, $157,000,000 for fiscal year 1994, and $169,000,000 for fiscal year 1995, and based on overvaluations ordered appropriate abatement of the real estate taxes for each of those years.[2] The board concluded that the assessed value of $184,417,000 for fiscal year 1996 was consistent with the fair cash value of the property.

The property is located in the heart of Boston's central business district, on a lot containing approximately 50,000 square feet of land. The property is bounded on the north by State Street, on the east by Kilby Street, on the south by Exchange Place, and on the west by Congress Street. The property consists of a forty-story office tower constructed in 1984 connected by means of a seven-story atrium to the eleven-story Exchange Building, a fully rehabilitated structure built in 1889. The Exchange Building is designated as a landmark by the Boston Landmarks Commission as the site of the original Boston Stock Exchange. Exchange Place has 1,120,162 square feet of rentable floor area, including first floor and basement level retail and office spaces. The property also has three levels of parking with a total of 129 possible parking spaces.

Both parties introduced expert evidence of the fair cash value of the property. The taxpayer presented two real estate appraisers, Charles Kenny and Martin J. Coleman, and the assessors introduced the testimony of their real estate appraiser, Charles B. Akerson. All these experts agreed that the direct capitalization of income approach was the best method by which to determine the property's fair cash value. The taxpayer's experts considered, but declined to apply, the sales approach and the cost approach, asserting that there was insufficient data to support the sales approach, and that the cost approach was inappropriate, unreliable, and not used by market participants. The assessors' expert considered and applied these approaches, but did not utilize the derived numbers in his final opinion of fair cash value.

The board agreed that the direct capitalization of income ap-

---

[2]The board granted abatements for the property in the amount of $1,286,701.56 for fiscal year 1992, $1,071,312.11 for fiscal year 1993, $930,099.84 for fiscal year 1994, and $590,414.40 for fiscal year 1995. The abatements granted totalled $3,878,527.91.

proach was the best method to apply in the appraisal of the property. The direct capitalization of income method analyzes the property's capacity to generate income over a one-year period and converts the capacity into an indication of fair cash value by capitalizing the income at a rate determined to be appropriate for the investment risk involved. In reaching a fair cash value for the property by means of the direct capitalization of income method, appraisers analyze competitive facilities and determine market rents, market vacancy and credit loss rates, market expenses, market capitalization rates, and general market conditions.

The experts reached different conclusions regarding some of the factors. In particular, the assessors' expert, Akerson, concluded that in deriving the appropriate market figures, the property should be compared to an exclusive class of office towers, which he called "super-class" or "Class A+" buildings, based in part on the property's age, high occupancy rates, and rental rate performance. The taxpayer's experts, Coleman and Kenny, concluded that the property should be compared to a broader market of Boston properties. This fundamental difference in the defined relevant market, as well as differing interpretations as to the actions of the market, caused the appraisers to derive differing numbers for the various components of the direct capitalization of income approach.

The board concurred with the appraisers that the highest and best use of the property was its existing use as an office building, with limited retail uses and a parking facility. The board also concurred with the appraisers that the period in question, the early 1990's, was one of "the most depressed economic periods in recent memory." The board agreed with Kenny's division of the property into three tiers for the purpose of determining fair market rents, and applied fair market rental rates within the range supplied by all three appraisers. The board adopted Kenny's figures for parking and tenant electricity income, but used Coleman's figures for miscellaneous income, which were based on actual charges to lessees for additional requested services. The board agreed with Akerson's characterization of Exchange Place as a "Class A+" building, based on its location, age, construction quality, design, historical significance, tenant finish, superior tenant financial rating, lease terms, and rents. Accordingly, the board adopted Akerson's vacancy and credit loss rates, which were lower than the figures

used by the taxpayer's appraisers, because they were based on the rates experienced by the "Class A+" buildings rather than the more depressed larger market. The board adopted operating expenses and other costs based primarily on those actually incurred at the property, supported by figures for the other buildings in the central business district as reported by Coleman. The tenant improvement allowance figure used by the board was based on Akerson's figure, actual figures, and the five-year average tenant improvement estimate reported by the Building Owners and Managers Association (BOMA). Similarly, the leasing commission deduction figure adopted by the board was based on actual figures and the five-year average reported by BOMA. Finally, the board adopted capitalization rates most consistent with those presented by Akerson, which focus on the lower risk associated with ownership of a highly desirable building in an excellent location.

1. The core of the taxpayer's appeal is that the board erred by finding and concluding that a "Class A+" office tower submarket existed in Boston. The taxpayer asserts that this aspect of the board's decision "runs afoul of the two cardinal principles long established by this Court," namely, the finding of the existence of a "Class A+" office tower submarket is not supported by substantial evidence, because the assessors' expert's (Akerson's) "sub-market [conclusion] was not based upon first hand knowledge and has no independent support in the record in this case." We reject these contentions.

We inquire whether, as matter of law, the evidence is sufficient to support the board's findings. See *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). Our review of the sufficiency of the evidence is limited to "whether a contrary conclusion is not merely a possible but a necessary inference from the findings." *Id.*, quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996).

The taxpayer claims that Akerson lacked the requisite personal familiarity with the market to substantiate his designation of the so-called "A+" submarket. In addition to having personally viewed many of the comparison properties, Akerson, with nearly forty years of experience as an appraiser, and having performed appraisals and undertaken review appraisals of office towers in Boston, has both familiarity with the market and a trustworthy source of market data, namely, the staff at the

firm with which he is associated. As noted in *General Elec. Co. v. Assessors of Lynn*, 393 Mass. 591, 601 (1984), "there is no requirement that experts must derive their opinions exclusively from direct personal observations." Experts may thus rely in part upon trustworthy sources of information in forming their opinions.

Further, there is independent support in the record to substantiate the existence of the submarket described by Akerson. Both Coleman and the taxpayer's real estate market expert, Michael J. Joyce, testified that "trophy properties" existed in Boston. Kenny supplied a "market overview" in his presentation which included an article which indicated that there are "premium" properties and identified Exchange Place as a "trophy" building. Kenny described Exchange Place as "top class" in testimony, and in his appraisal listed fourteen buildings with which the property was "most comparable." Akerson cited an article from 1992 by one of Kenny's partners in the house journal of Kenny's firm, which described a Boston submarket of "elite tenants" looking for high rise sites with characteristics similar to those described by others in "trophy" or "A+" properties. The board concluded that the description used by Akerson accurately described a group of buildings, which were identified as "A+", highly comparable to Exchange Place.[3] We conclude that there was sufficient evidence to support the decision of the board that there was a small group of Boston office towers, be they classified "A+" or "trophies" or "premium" properties, that were most similar to the property in the years in question.

2. The taxpayer's remaining arguments concern the board's findings as to vacancy rate, credit loss, capitalization of income rate, tenant improvements, and leasing commissions. The taxpayer contends that these findings lack adequate support in the record. We disagree.

(a) The board found with respect to vacancy and credit loss rates that Akerson's use of a figure that closely corresponded with the actual experience of Exchange Place, and other "A+" or "trophy" buildings which were not in a "lease up" period, was most credible. This finding was consistent with the board's conclusion that the property was among the most desirable in

---

[3]Prior to the hearing, the hearing commissioner personally visited all the buildings that Akerson, for the assessors, and Kenny, for the taxpayers, argued were "most comparable" to Exchange Place.

Boston at the time, and therefore was, as were other like properties, of proven caliber, in high demand, and attracting the highest quality tenants. The board's determinations have support in the record.

(b) The board considered testimony by all the experts and applied its specialized knowledge to the selection of relevant capitalization rates. It adopted rates between those used by Coleman and Kenny for the taxpayer, and Akerson for the assessors, for fiscal years 1992 and 1993, and rates corresponding with those derived by Akerson for fiscal years 1994 through 1996.[4] "The board did not accept the actual computations of any witness and was not obliged to do so." *Alstores Realty Corp.* v. *Assessors of Peabody*, 391 Mass. 60, 66 (1984), quoting *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 700 (1972). The board's selection of capitalization rates in 1992 and 1993 which were "somewhat higher than Mr. Akerson's based on the market conditions and other evidence introduced by the [taxpayer] as well as the board's own judgment" shows the board's exercise of independent decision-making based on the evidence. See *id.* All three appraisers discussed the derivation of their rates and the factors they considered in arriving at the rate. Coleman, for example, described his use of the "band of investment technique."[5] See Appraisal Institute, The Appraisal of Real Estate 517-520 (11th ed. 1996). In order to arrive at a capitalization rate by this method, he had to reach his own opinions regarding market "interest rates, reasonable loan-to-value ratios, debt coverage ratios, equity yields, depreciation rates, and the risks of property ownership involved in the investment." Coleman had to consult numerous sources, which he presented to the board in his appraisal and in his testimony, and decide how much weight to assign the evidence such sources presented. The other appraisers undertook similar exercises, including use of the band of investment technique.

In short, the derivation of a rate of capitalization takes into account a large number of factors, and the calculation calls for

---

[4] The appraisers and the board all applied a tax factor for each fiscal year to the capitalization rates in arriving at an overall capitalization rate for each year.

[5] The band of investment technique involves the application of a complex formula which is set forth and explained in *Assessors of Brookline* v. *Buehler*, 396 Mass. 520, 525 n.3 (1986).

the use of a broad variety of data and a considerable measure of professional judgment. There was substantial evidence before the board to support its conclusions as to the capitalization rates.

(c) The board's determination of tenant improvements and leasing commission costs is supported by substantial evidence, and is not merely based upon actual experience in the property for the years in question. The tenant improvement allowance of $1.00 per square foot, selected by Akerson and accepted by the board, is above that actually experienced at the property, which was $.79 per square foot, and below the figures offered by the taxpayer's appraisers, which were $1.50 and $1.60. The five-year average tenant improvement allowance reported by BOMA was $1.35. Similarly, the annual leasing commission cost of $.20 per square foot was less than the actual experience at the property, and more than the average of $.17 per square foot reported for the period by BOMA for Boston downtown "Class A" buildings. Akerson made no deductions for the period in question, and the taxpayer's appraisers used $.60 per square foot. In this context the board could reasonably make independent judgments and conclude that the BOMA figures, as well as the experience within the subject property, should be accorded weight in the selection of tenant allowance and leasing commission figures. See *Donovan* v. *Haverhill*, 247 Mass. 69, 71 (1923); *One Cambridge Ctr. Trust* v. *Assessors of Cambridge*, 21 Mass. App. Tax Bd. Rep. 29, 67 (1997).

3. We reject the taxpayer's final contention that the board should have ordered that information provided to the assessors by other Boston office tower property owners be made available to the taxpayer under the provisions of G. L. c. 59, § 52B.

Under G. L. c. 59, §§ 38D and 61A, the assessors are authorized to collect from property owners or lessees data concerning income and expenses, rent rolls, leases executed, and any other information that they may reasonably require in order to determine the fair cash value of a property. The taxpayer desired access to information provided by property owners of other Boston office towers to the assessors, and sought this information in discovery. The board denied the taxpayer's motion to compel the assessors to produce this information. Under G. L. c. 59, § 52B:

"[a]ll information collected pursuant to [c. 59, §§ 38D,

38E, 61A, and c. 58A, § 8A] shall be open to inspection of the assessors . . . and such other officials of the commonwealth or of its political subdivisions who have occasion to inspect such information in the performance of their official duties, *but to no other person except by order of the appellate tax board or a court,* except that if the assessor bases a valuation of an assessed owner's real . . . property, in whole or in part, on a comparable sale, or sales, the assessor shall provide any market data relating to such comparable sale or sales to the assessed owner of the property or his designated representative upon request" (emphasis added).

The taxpayer argues that the data collected are uniquely available to the assessors, and that such information would be useful to its expert witnesses in determining the value of the property. Conversely, the assessors argue that the purpose of § 52B is to exempt the information collected from property owners from the Commonwealth's otherwise broad definition of public records in order to promote compliance with § 38D, for example, by preserving confidentiality.

In the matter of discovery, the board is accorded considerable discretion. *Assessors of Provincetown* v. *Vara-Sorrentino Realty Trust,* 369 Mass. 692, 694 (1976). We find no abuse of that discretion in the board's denial of access by the taxpayer to information provided to the assessors in confidence. Owners of income-producing properties assiduously guard information that might be used to the advantage of their competitors.[6] In order to derive accurate assessments, the assessors need access to this information. It is only with strong assurances of confidentiality that such information is willingly produced, and it should not be released merely for the convenience of litigants. The expert appraisers were able to produce a great deal of market information, and none of them was given access to these data. Thus, for public policy reasons, the board's decision in this case to withhold the assessors' confidential data was within its discretion.

Finally, the taxpayer argues on appeal that the statute dictates that taxpayers be given access to all market data relied on by assessors in valuing the property at issue. We decline to consider the point since the taxpayer did not raise the precise issue before

---

[6]We note, for example, that the taxpayer sought and received a protective order for material submitted to the court for this proceeding.

the board. See *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 608 (1984). These determinations resolve the taxpayer's appeal. We turn now to discussion of the assessors' appeal.

4. We reject the assessors' assertion that the board erred by not dismissing the appeal under G. L. c. 59, §§ 38D, 38E, and 61A, because the taxpayer failed to produce a witness or witnesses with knowledge of the fair cash value of the property.

General Laws c. 59, § 38D, requires that, for assessment purposes, the owner provide such information to the assessors as required to determine the actual fair cash value of a property, and G. L. c. 59, § 61A, provides that, in appealing an assessment, a person applying for an abatement:

"shall, upon request, exhibit to the assessors the property to which the application for abatement relates and if required . . . furnish under oath such written information as may be reasonably required by the board of assessors to determine the actual fair cash valuation of the property."

General Laws c. 59, § 38E, provides that the assessors may require a taxpayer appealing an assessment to testify under oath. Finally, both §§ 38D and 61A state that dismissal of an appeal is not warranted if a taxpayer is unable despite good faith to comply with any request made.

The assessors attempted to have a representative of the taxpayer produced who would testify as to the taxpayer's own opinion of the property's value. The hearing subpoenas ultimately issued to the taxpayer ordered "NBB-53 State Street Associates, Limited Partnership" [NBB] and "WFP 53 State Street Company Limited Partnership f/k/a Olympia & York State Street Company" [WFP],[7] to appear and to "give evidence of what you know relating to an action of tax appeal." The

---

[7]Part of the difficulty of this case results from the complications that result when a "taxpayer" is a complex corporate entity. The taxpayer in this case, Olympia & York State Street Company, is now known as WFP 53 State Street Co. Limited Partnership. One of the general partners of WFP State Street Co. Limited Partnership is NBB-53 State Street Associates, Limited Partnership. This entity is presumably a subsidiary of Nomura, Babcock and Brown, which, according to the assessors, is "an American subsidiary of the Japanese Nomura financial empire." Mr. Asai, the senior United States-based representative of Nomura, appeared to respond to the subpoena from the Appellate Tax Board to "NBB-53 State Street Associates, Limited Partnership."

revised subpoenas to NBB and WFP required them to appear and bring "all documents relating to any statements made by you or on your behalf regarding the fee-simple [*sic*] value of the property located at 53 State Street in Boston, Massachusetts, from January 1, 1990 to the present." In response to the subpoenas, the taxpayer produced one Mr. Asai, for NBB, and David A. Foley, an employee of WFP and manager of the property, and sent affidavits stating that they were unable to produce any documents regarding the property's fee simple value. At the hearing, after determining that Foley had no authority to purchase or sell the property or to settle the dispute, and that he had no personal opinion or knowledge as to the fee simple value of the property, the assessors moved to dismiss the taxpayer's appeals because "the company had an obligation to deliver a witness" who had an opinion of the property's fair cash value. The assessors never called Asai to testify, and thus never determined whether he could provide them with the information they desired.

The assessors claim that the board ruled categorically that they could require the taxpayer to produce a witness or witnesses competent to respond to questioning on the fair cash value of the property. The board made no such categorical ruling. The assessors sought clarification from the board regarding who could be subpoenaed and what the subpoenaed witness might testify about. The hearing held on the issue produced no satisfactory answers, and leaves us to rely on the language of the subpoenas to resolve the appellate claim. While the frustration of the assessors is understandable, we discern no error. A more carefully worded subpoena could have clarified an obligation of the taxpayer to produce the type of witness the assessors desired. Further, the assessors' failure to call Asai to the stand to determine the extent of his knowledge and his opinions as to the property's fair cash value undercuts their argument that they were denied information that the taxpayer was required to furnish.

5. Finally, we find no error in the board's determination that the assessors were not entitled to introduce in evidence taxpayer's estimates of value of its leased-fee interest in the property.

The taxpayer owns a leased-fee interest in the property, which is to say, they have a long-term leasehold on (but do not own) the land, and own the building subject to the long-term leases

held by tenants. The assessors must determine a fair cash value for the property as a fee simple estate, which is to say, they must value an ownership interest in the land and the building as if no leases were in effect. A real estate tax is a " 'tax upon the whole land and not merely on the interest of the person taxed.' Therefore, the assessment must be 'on the entire estate and not upon any interest therein.' " *Pepsi-Cola Bottling Co.* v. *Assessors of Boston,* 397 Mass. 447, 450 (1986), quoting *Donovan* v. *Haverhill,* 247 Mass. 69, 71-72 (1923). The value of the taxpayer's ownership interest, the leased-fee interest, would differ from the fee simple value of the property. The assessors sought access to appraisals of the leased-fee estate held by the taxpayer that had been prepared and presented in certain bankruptcy proceedings. To support their request, the assessors argued, first, that the appraisals constituted evidentiary admissions or prior inconsistent statements, and second, that, since fee simple values were derived from data from leased-fee interests, the board was being inconsistent by allowing fee simple appraisals but not leased-fee appraisals. The board, in refusing to allow discovery or testimony regarding the leased-fee appraisals, appeared to agree with the taxpayer that valuations of the leased-fee interest were not relevant or would be misleading. On appeal, the assessors bear the burden of establishing that the appraisals "would be so relevant to [their] case as to warrant a conclusion that the board abused its discretion." *Irving Saunders Trust* v. *Assessors of Boston,* 26 Mass. App. Ct. 838, 846 (1989).

We disagree with the assessors' argument that the prior appraisals are admissions or prior inconsistent statements of property value. The cases cited by the assessors, *Assessors of Brookline* v. *Buehler,* 396 Mass. 520, 531-532 (1986), and *General Elec. Co.* v. *Assessors of Lynn, supra,* do not support their contentions. In both cases, at issue was the fair cash value of properties, and the board admitted evidence from other proceedings presenting opinions of the fair cash value of the fee simple estate of the properties in question. In the *Buehler* case, the board admitted an owner's opinion of the fair cash value of his fee simple estate made before a rent control board. See *Buehler, supra* at 531. In the *General Elec. Co.* case, the board admitted the Lynn assessors' opinion of the fair cash value of the fee simple estate of some General Electric property that had been provided as an answer to an interrogatory in an unrelated

proceeding before the board. Their opinion was based on an appraisal of that property commissioned by General Electric and checked against a report prepared by the assessors of the fair cash value of all industrial property in Lynn. See *General Elec. Co.*, *supra* at 602-603. The assessors in this case argue that in the *General Elec. Co.* case, the assessors' estimate of the fair cash value of the fee simple estate for the General Electric plant was a "derived value"[8] in the same way that a fair cash value of the fee simple estate of Exchange Place would be a "derived value" from an appraisal of the taxpayer's leased-fee estate. This assertion is not correct.

The relationship of the leased-fee value of the taxpayer's interest in Exchange Place to the fee simple value of the property is not a simple sum, as all the experts testified. If there is any relationship at all between the two values, it must be derived by performing a series of evaluations and computations on the one to reach the other. The essence of the assessors' argument is that one can construct an opinion of fee simple value using an opinion of a leased-fee value. The method by which this takes place is called a "sum of the parts" valuation, in which the sum of the value of lesser interests, such as the leased-fee and leasehold interest, are added to arrive at a fee simple value.[9] They argue that doing so in this case would result in a showing that the taxpayers had an opinion of the fee simple value that exceeded that provided by their experts. Even if this were true, the opinion would be indirectly proven at best, requiring many inferences, such as the exact relation of each of the taxpayer's sub-leases to market at a given point in time. Assuming that the bankruptcy court appraisals could thus be obliquely used as representing the owner's opinion of value, the

[8]The assessors assert that the figure was a "derived value" "because it was necessary for the [b]oard to manipulate the information in the report in order to derive the valuation." We disagree with this assertion, because it was the Lynn assessors who "manipulated" the final estimate of the fair cash value, not the board. The board was presented with a figure that required no manipulation. Even accepting the assessors' proposition, "deriving" a fair cash value for one industrial property from a number that is represented as being the sum of the fair cash value of all industrial properties is not equivalent to "deriving" a fair cash value from a leased-fee value.

[9]None of the appraisal experts used this method to compute the fee simple value, and Akerson acknowledged that this is "not necessarily the best way to get fee simple value." He stated that it would be necessary to look at the existing sub-leases and assign them negative or positive interests according to their relationship to the market value.

assessors would be hard-pressed to show that this potential evidence was an admission, and that the board erred by not admitting it. See *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 498 (1976). As stated before, the admission of evidence is left largely to the discretion of the board, and that discretion was not abused here.[10]

Finally, we reject the assessors' argument that the board's exclusion of the leased-fee appraisals was inconsistent with its admission of the experts' appraisals, which they claimed were based on leased-fee data. On the contrary, the experts all contended that their appraisals were based on market lease data, designed specifically to screen out nonmarket sub-leases that would be contained in and would be the basis for leased-fee appraisals. Further, the lack of relevance of leased-fee data is underscored by the fact that none of the appraisers relied on the sales comparison approach, because the sales during the relevant time period represented leased-fee values and not fee simple values. The board properly determined that leased-fee appraisals were irrelevant or likely to mislead.

> *Decision of the Appellate Tax*
> *Board affirmed.*

---

[10]We do agree that the narratives that accompanied the appraisals of the leased-fee interests might have been relevant not to show values, but to show that the taxpayers considered their property an "A+." The board was sufficiently convinced of this proposition by the evidence before it at the hearing, and thus the assessors can not show substantial prejudice by the exclusion.