## CLARENCE PETERSON, JR. *vs.* BOARD OF ASSESSORS OF BOSTON.

No. 03-P-143.

Suffolk. April 1, 2004. - November 5, 2004.

Present: LENK, COWIN, & DOERFER, JJ.

*Taxation,* Real estate tax: assessment, Real estate tax: value. *Evidence,* Quali-fication of expert witness. *Witness,* Expert.

The Appellate Tax Board, acting on appeals by the taxpayer under the formal procedure, G. L. c. 59, §§ 64, 65, regarding real estate tax assessments on certain commercial real property, did not err either in admitting the testimony of the taxpayer's expert witness or in relying on it in reaching certain of its conclusions, where the objections to the testimony appeared to go to its weight, not its admissibility. [432-433]

The record in appeals by the taxpayer under the formal procedure, G. L. c. 59, §§ 64, 65, regarding real estate tax assessments on certain commercial real property did not support the determination of the Appellate Tax Board (board) that net service income should not be attributed to the property [433-435]; however, substantial evidence supported the board's determina-tion as to operating expenses [435-436], and the board was not unreason-able in believing that a sinking fund should be established for major renovations, and that the value of the property should be adjusted accord-ingly [436-438]; finally, the board acted within its authority in adopting a reserve for general capital repairs and improvements, and acted reasonably in reducing the allowance for general capital repairs and improvements by virtue of the existence of "pass-through" provisions in the property's leases [438-439].

APPEAL from a decision of the Appellate Tax Board.

*Richard L. Wulsin* for the plaintiff.

*Philip Burling* for the defendant.

COWIN, J. We consider cross appeals by Clarence Peterson, Jr. (the taxpayer), and the board of assessors of Boston (the asses-sors) from a decision of the Appellate Tax Board (the board) · acting on appeals by the taxpayer under the formal procedure, see G. L. c. 59, §§ 64, 65, regarding real estate tax assessments

on real property at One Federal Street, Boston (the property), for the fiscal years 1997 through 2001.[1] The taxpayer filed timely applications for abatement with respect to each year, all of the applications being denied by the assessors. The taxpayer then filed timely appeals with the board. The board upheld the assessors' valuations for fiscal years 1997, 1998, and 2001, but concluded that the property was overvalued with respect to fiscal years 1999 and 2000.[2] Each party appealed with reference to the fiscal years for which it had received adverse determinations. We affirm the board's decision in favor of the assessors for fiscal years 1997, 1998, and 2001. We disagree with the board's decision in favor of the taxpayer for fiscal years 1999 and 2000 on a single issue (its treatment of service income), and we remand for a redetermination with respect to those years.

1. *Background.* The property is a "Class A" commercial office building located in the financial district of Boston. The parties and the board agreed that the highest and best use of the property, see *Irving Saunders Trust* v. *Assessors of Boston*, 26 Mass. App. Ct. 838, 843 (1989), was its continued existing use. To valuate the property, the parties' expert witnesses and the board employed the capitalization of net income approach. See *Taunton Redev. Assocs.* v. *Assessors of Taunton*, 393 Mass. 293, 295 (1984). The assessors' expert, Pamela S. McKinney, also employed a comparable sales approach and a cost approach. The board struck her testimony based on a cost approach because the witness was neither an engineer nor an architect, and because the property is neither special purpose nor newly constructed. See *Correia* v. *New Bedford Redev. Authy.*, 375 Mass. 360, 362 (1978). The board gave no weight to her comparable sales testimony because the sales on which she relied were sales of "leased-fee" interests, requiring adaptations not conducted by the witness before they would be useful in a

---

[1]The assessors determined the assessed value of the property at the assessment dates for the fiscal years in question to be $145,174,000 (fiscal year 1997); $166,173,000 (fiscal year 1998); $205,414,500 (fiscal year 1999); $262,745,500 (fiscal year 2000); and $317,776,488 (fiscal year 2001).

[2]The board ruled that the assessors had overvalued the property by $2,414,500 for fiscal year 1999 and by $9,445,500 for fiscal year 2000. The board ordered that abatements of $89,433.08 and $323,130.56 be granted for the respective years.

"fee simple" valuation. See *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 248 (1998). The board ultimately selected a capitalization rate of nine percent, plus a tax factor,[3] thereby choosing a rate between the rates recommended by the parties' experts. Neither the use of net income capitalization nor the capitalization rate selected is challenged by the parties on appeal.

The board calculated the effective gross income of the property by adopting elements of each expert's opinion. The board may permissibly accept such portions of the evidence as appear to it to be more convincing. *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. 60, 72 (1941). It relied in large part on the testimony of the taxpayer's expert, Charles Kenny, to determine market rents for the office floors and for the club located on the thirty-eighth floor. However, it adopted Ms. McKinney's approach to rentals for first-floor retail space and for the parking garage.[4] In accordance with Mr. Kenny's opinion, and contrary to that of Ms. McKinney, the board did not recognize income attributable to utility reimbursements, service income,[5] or miscellaneous income, on the theory that such income was totally offset by the costs associated with earning it. The board's finding that the building could be expected to generate no net service income is the only determination regarding income that has been appealed to this court (i.e., by the assessors).

To arrive at net income figures to be capitalized for each of the years under review, the board made findings regarding expenses to be deducted from gross income. Those findings have generated the remaining appellate issues. The board found, in accordance with the opinion of Mr. Kenny, that the building's

---

[3]The tax factor is a percentage added to the capitalization rate to reflect the tax that will be payable on the assessed valuation produced by the capitalization formula. See *Assessors of Lynn* v. *Shop-Lease Co.*, 364 Mass. 569, 573 (1974).

[4]Income attributable to the basement storage space was taken from the taxpayer's rent rolls, the board having determined that those rents reflected the market for such space.

[5]Service income is income received by the owner for providing additional services requested by tenants, e.g., off-hours use of premises and special cleaning and security.

operating expenses were considerably higher than those calculated by the assessors' expert, thereby substantially reducing the building's net income — a conclusion that the assessors challenge. The board also agreed with Mr. Kenny that a sinking fund for future renovation of the building lobby was appropriate, thus further reducing the net income to be capitalized, and the assessors appeal with respect to this determination as well. The assessors also appeal from the denial by the board of their motion to exclude Mr. Kenny's opinion testimony altogether, asserting that the opinion was inadequately supported, relied on unidentified hearsay sources, and failed to meet the "gatekeeper" requirements of *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994).

The taxpayer appeals on a single subject, that subject also being related to the board's treatment of deductions from gross income. In this regard, the board rejected the opinion of Mr. Kenny that a significant reserve for capital repairs and improvements was required, adopting instead the view of Ms. McKinney that lease provisions calling for the "pass-through" to tenants of much short-term capital expenditure made Mr. Kenny's substantial reserve unnecessary. The taxpayer argues that the pass-through provisions are irrelevant in a valuation process in which new economic rent must be determined each year, and that the board ignored the amounts actually paid by the taxpayer for the capital items in question.

2. *Discussion.* In examining the various issues, we are guided by familiar criteria expressed over the years with respect to administrative decisions of this nature. Decisions of the Appellate Tax Board must be supported by substantial evidence, see *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 465 (1981), meaning that findings must be based on "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), inserted by St. 1954, c. 681, § 1. A reviewing court's determination whether the board's findings are warranted must be made on a consideration of the entire record, *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), taking into account "whatever in the record fairly detracts from [the] weight" of the evidence supporting the decision. *Ibid.*, quoting from *Univer-*

*sal Camera Corp.* v. *National Labor Relations Bd.*, 340 U.S. 474, 488 (1951). Particularly when dealing with a complex, sophisticated subject such as real estate valuation, we give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14(7). See *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 605 (1984). With these principles in mind, we turn to the specific issues.

a. *Expert testimony.* The assessors moved unsuccessfully to exclude the testimony of the taxpayer's expert witness (Mr. Kenny) altogether, and now challenge the board's decision in that respect. They argue that Mr. Kenny's testimony failed to comply with standards of appraisal practice established by the Uniform Standards of Professional Appraisal Practice and the Appraisal Institute. In this regard, they attack the witness's reliance on his own outdated experience with the property and his failure to review more recent information; his refusal to employ a comparable sales approach to valuation; his alleged inability to identify the sources of information on which he relied in his income analysis; and alleged deficiencies in his methodology with respect to certain issues. They conclude that his testimony should have been stricken as unreliable under *Commonwealth* v. *Lanigan, supra.*

The board did not err either in admitting Mr. Kenny's testimony or in relying on it in reaching certain of its conclusions. Given Mr. Kenny's credentials, the board was entitled to qualify him as an expert witness. His rejection of comparable sales as an acceptable method of determining the value of the property was a choice he was entitled to make and then justify; the fact that data may have been available with which to conduct a comparable sales analysis with respect to leased-fee sales does not mean that it was available with respect to the fee simple appraisals performed for purposes of a real estate tax assessment. See *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. at 246-249. The record does not support the assertion that the witness was unable to identify sources of information. Real estate valuation experts often rely on compilations of data prepared in their own offices or by others. That reliance is subject to attack on cross-examination

or by the adverse party's own expert. Ultimately, it is for the board to decide, as it did here, which of the experts' views to credit. See *Assessors of Quincy* v. *Boston Consol. Gas Co.*, 309 Mass. at 72. Overall, the assessors' objections to Mr. Kenny's testimony appear to go to its weight, not its admissibility, and the determination of the weight to be accorded that testimony is for the board.

The suggestion that admission of this expert testimony, particularly its rejection of the comparable sales approach, contravenes the principles of *Commonwealth* v. *Lanigan*, 419 Mass. at 25-26, and *Canavan's Case*, 432 Mass. 304, 314-315 (2000), is unpersuasive. Those cases, coming in the wake of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), protect fact finders from exposure to expert testimony "that is not based on reliable methodology." *Canavan's Case*, *supra* at 315. They are designed to eliminate "junk science," or mere ipse dixit declarations of scientific reliability, as competent expert evidence. They were not meant to disqualify testimony of an admitted expert who adopts a recognized methodology, even though it is not the methodology on which the adverse party prefers to rely, and even though the adverse party may make a case that the recognized methodology may have been incorrectly applied in certain respects.

b. *Service income.* The assessors' expert (Ms. McKinney) testified that the building should reasonably generate additional net income as a result of utility reimbursements, service income, and miscellaneous income. The board rejected this opinion, concluding, in accordance with the view of Mr. Kenny, that the expenses associated with obtaining revenues from these sources were generally equivalent to the revenues received, thus producing no additional net income to be capitalized. The assessors appeal only with respect to the category of service income (i.e., charges for additional services requested by tenants). We agree that the board's determination that net service income should not be attributed to the property is not supported by substantial evidence.

The assessors introduced evidence that the taxpayer actually earned net service income in each of the tax years under review.

While this is not by itself determinative,[6] it is a factor that the board may, in its discretion, take into consideration. In addition, there was evidence that other "Class A" office buildings in the Boston financial district realized net service income during the relevant period, including the results of a downtown Boston office building survey conducted by the Building Office Managers Association (BOMA). Indeed, the taxpayer's own business plans reflect anticipated net service income. On the basis of the above analysis, the assessors' expert included, as net income to be capitalized, a factor reflecting service income of $.20 per square foot.

The taxpayer did not attempt a direct rebuttal of the assessors' evidence in this regard. Rather, the taxpayer's expert opined essentially that the statements showing the existence of net service income were misleading because they incorporated only the "direct" costs associated with providing services, and did not account for indirect costs such as the expense of supervision. He testified that he "wanted to get an operating cost of the building without any excess services that would be supplied to the tenants." He relied also on a statement by the building managers that they did not believe that they made money on tenant services. The board adopted Mr. Kenny's view that service revenues were offset by the concomitant costs, stating, without further elaboration, that "these extraneous expenses [to generate service income] . . . are essentially a wash with any related income."

Despite the assessors' evidence to the contrary, that finding might carry the day on the theory that the costs associated with the production of service income should, to be accurate, be augmented to account for indirect costs such as overhead. The problem with this proposition is that the taxpayer's own quarterly reports show that the direct costs of providing extra tenant services are marked up by a factor of fifteen percent to account for related administrative overhead. No other evidence

---

[6]The objective is to determine "the property's capacity to generate income over a one-year period," *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. at 239, not the actual performance of the property during that period (because actual performance may for various reasons be better or worse than reasonable market expectations).

was presented on the subject. That being the case, and the rationale provided by the taxpayer regarding the effect of indirect costs having been rebutted by the taxpayer's own records, we conclude that the board's finding on this issue is not supported by substantial evidence.

c. *Operating expenses.* Through testimony of its respective experts, each party offered its view of reasonable operating expenses associated with property of this nature during the years in question. On behalf of the taxpayer, Mr. Kenny treated operating costs as including general and administrative costs, property management fees, security costs, repairs and maintenance, cleaning, utilities, insurance, and miscellaneous nonreimbursable expenses. He excluded expenses for tenant electricity on the theory that the taxpayer received full reimbursement from the tenants for these outlays. In determining the amounts to be recognized as proper deductions from effective gross income, Mr. Kenny relied on the building's actual history, the expenses incurred in the operation of comparable properties, and a BOMA survey. He concluded that appropriate operating cost allowances equaled $6.50 per square foot for fiscal year 1997; $7.00 per square foot for fiscal year 1998; and $7.50 per square foot for fiscal years 1999 through 2001.[7]

The assessors offered contrary testimony of Ms. McKinney based primarily on the actual expenses of the subject property, with some reference to the experience of comparable office towers in the Boston financial district and to BOMA statistics. Somewhat counterintuitively, she arrived at operating expense figures for the years in question that were higher than those determined by the taxpayer's expert.[8] However, the apparent discrepancy is explained by the fact that Mr. Kenny excluded from his analysis all expenses associated with providing tenant electricity (concluding that they were offset by reimbursements

---

[7] With respect to the parking garage, Mr. Kenny adopted figures equal to thirty percent of the imputed market rent for that portion of the property, a figure that he testified compared favorably to that of an equivalent adjacent garage.

[8] Ms. McKinney testified that appropriate allowances equaled $7.12 per square foot for fiscal year 1997; $7.85 per square foot for fiscal year 1998; $8.08 per square foot for fiscal year 1999; $8.15 per square foot for fiscal year 2000; and $8.40 per square foot for fiscal year 2001.

for such service), whereas Ms. McKinney included the expenses of that service. When those expenses are removed and the respective analyses are made comparable, the assessors' operating expense figures are lower than those calculated by the taxpayer in each of the five years subject to this appeal.

The assessors argue that the board, while acknowledging the significance of actual operating costs, in fact departed from that experience and arbitrarily adopted theoretical cost figures that were higher than normal. That proposition is somewhat unfair both to the board and to Mr. Kenny. Neither suggested that actual operating costs determine the issue. Such a theory is inconsistent with the basic premise underlying valuation by capitalization of net income, namely that it is the net income that the property *should be* earning, not necessarily what it actually earns, that is the figure that should be capitalized. Actual operating experience was considered together with other factors. It was for the board to sift through the various considerations and choose what to accept. See *Alstores Realty Corp.* v. *Assessors of Peabody*, 391 Mass. 60, 64-65 (1984). We conclude that substantial evidence supported the board's choice. Indeed, the assessors' argument on the subject seems directed less to the legal sufficiency of the evidence than to what the board should or should not have credited. See *Assessors of Lynnfield* v. *New England Oyster House, Inc.*, 362 Mass. 696, 702 (1972).

d. *Reserve for lobby renovations.* Crediting the opinion of the taxpayer's expert, the board recognized as a proper expense a reserve of $300,000 per year to provide for periodic rehabilitation of the building lobby. The board found in this regard that buildings of this nature require periodic lobby refurbishing in order to maintain their perceived quality in the marketplace; that expenditures were necessary to undertake such refurbishing approximately every twenty years; and that a sinking fund designed to accumulate funds for that renovation at present costs over a twenty-year period was an appropriate mechanism by which to provide for the anticipated outlay. Recognition of the reserve obviously increases expenses, reduces net income, and reduces the ultimate valuation of the property.

The assessors challenge the finding, arguing that the evidence

demonstrated that, at least in the earlier years under review, the taxpayer was still paying for a previous refurbishment of the lobby; that an owner would be unlikely to fund in advance a renovation that was unlikely to take place during his tenure[9]; and that the present taxpayer in fact had no such sinking fund in place. They observe as well that a contemporaneous appraisal of the property performed by Harris Collins, a partner of Mr. Kenny, did not include a sinking fund for the lobby. According to Ms. McKinney, any need to renovate the lobby again some twenty years after completion of the recent renovations had no impact on the valuation of the property on the tax assessment dates in question. In other words, no seller of such property from January 1, 1996, to January 1, 2000 (the first and last assessment dates), would reduce the selling price in recognition of the purchaser's need to establish a sinking fund for something that would not take place for two decades.

In contrast, Mr. Kenny defended establishment of the sinking fund by reference to the view of the Appraisal Institute that it is appropriate to fund in advance for components that wear out at a rate faster than the overall structure. He defended the fact that his partner, Mr. Collins, had not provided for a lobby reserve in his appraisal of the property, on the basis that the Collins appraisal was a leased-fee appraisal that dealt with actual expenses rather than the kind of fee simple appraisal customarily employed for real estate tax valuation purposes wherein income and expense are imputed. He expressed the opinion that the absence of an actual sinking fund on the books of the taxpayer was irrelevant, and that the need for periodic renovation of a component such as the lobby had to be taken into account in determining the fair cash value of the property.

Both approaches have merit, which is not surprising given that they are products of analyses by competent professionals. The choice between them seems to us to be particularly appropriate for the agency wherein lies the expertise on the subject. See *Alstores Realty Corp.* v. *Assessors of Peabody, supra.* That the board believed that a sinking-fund approach to a

---

[9]There was evidence that properties of this nature tend to change ownership on an average of every ten years, whereas the lobby probably would not be renovated for twenty years.

major renovation was appropriate, and that the value of the property should be adjusted accordingly, was not unreasonable.

e. *Reserve for replacement.* We turn to the appeal of the taxpayer, whose single issue is that the board erroneously adopted an inadequate reserve for general capital repairs and improvements, thereby artificially increasing the valuation of the property for real estate tax assessment purposes. With respect to this item, the board agreed with Ms. McKinney's conclusion that there should be a reserve equal to one percent of the building's effective gross income, in part because a number of the items for which the taxpayer would otherwise incur expense are "passed through" to tenants pursuant to terms incorporated in leases. The board found also that Ms. McKinney had properly considered the building's condition, relevant market leases, and capital plans. The board rejected Mr. Kenny's opinion that a much higher reserve, amounting to more than six percent of effective gross income, was required, also observing that Mr. Kenny's figures did not take into consideration lease pass-through provisions; exceeded national reserve-for-replacement averages by 600 percent; and may have improperly included capital expenditures other than short-term items.[10] It was for the board to decide which approach to adopt. It acted within its authority in finding that Ms. McKinney's views on the subject led to a more reliable determination, particularly where it was unclear how many of Mr. Kenny's anticipated new projects would actually come to fruition.

We believe that the board also acted reasonably in reducing the allowance for general capital repairs and improvements by virtue of the existence of pass-through provisions in the building's leases. The evidence showed that such provisions are not unique to this property, but are familiar features of leases in similar office buildings. It seems obvious that net income at any given time will not be reduced by expenses that the owner does

---

[10]The board also rejected the taxpayer's proposed reserve for expenses associated with the garage, adopting instead the assessors' position that no reserve was necessary. The board could reasonably determine that the taxpayer's suggested twenty-two percent expense ratio for the garage mingled capital and operating data, and that the taxpayer's evidence on the subject was not sufficient to demonstrate error on the part of the assessors. See *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. at 599.

not in fact pay. The taxpayer does not challenge that proposition. Rather, he argues that the pass-through provisions should be ignored because they allow for reimbursements by tenants only with respect to increases over expenses incurred by the owner in an identified base year. However, the argument continues, in the context of valuations for real estate tax assessment purposes, a new economic rent is determined for each year under review. Thus, each year is in effect a base year; there are no increases in expenses over a base year; and therefore none of the costs can be passed through to the tenants. Thus, the taxpayer concludes, pass-through provisions are irrelevant in tax abatement cases, and he should not be deprived of recognition of expenses that are actually incurred (regardless of who pays them) to earn the imputed rent in each tax year.[11]

The argument is highly theoretical. That valuations for tax purposes involve imputed income streams determined on an annual basis does not require that the board depart from reality altogether. If the evidence warrants a finding, as it assuredly does in this case, that pass-through provisions, as a matter of normal commercial practice, actually reduce the costs associated with operating the taxable property, the board may reasonably factor in that consideration in a net income capitalization analysis. There was no error in this respect.

3. *Conclusion.* So much of the board's decision as regards fiscal years 1999 and 2000 is vacated, and the decision is otherwise affirmed. The case is remanded to the board for a determination with respect to net service income for fiscal years 1999 and 2000 in accordance with part 2.b above, and redetermination of abatements as required.

*So ordered.*

---

[11]This of course assumes that the expenses at issue are in fact reasonably incurred. In the present case, the board did not credit the taxpayer's position that all of the anticipated expenses were reasonably necessary.